UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

RONALD C. ROBERTS,

                 Plaintiff,             Civil Action No.: 13-14675
                                        Honorable Lawrence P. Zatkoff
         v.                       Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                 Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [17, 21]

Plaintiff Ronald Roberts brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [17, 21], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ) omitted relevant portions of the record and pervasively mischaracterized others, preventing this Court from conducting meaningful substantial evidence review of her opinion. In addition, she failed to comport with the strictures of the treating physician rule, an error this Court cannot find harmless. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [21] be DENIED, Roberts's motion [17] be GRANTED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REMANDED

for further consideration consistent with this Report and Recommendation.

## II.   REPORT

### A.   Procedural History

On September 13, 2011, Roberts filed an application for DIB, alleging disability as of March 15, 2011.  (Tr. 120-28).  The claim was denied initially on November 29, 2011.  (Tr. 68-71).  Thereafter, Roberts filed a timely request for an administrative hearing, which was held on June 22, 2012, before an ALJ.  (Tr. 37-56).  Roberts, represented by counsel, testified at the hearing, as did a vocational expert ("VE").  *Id.*  In a written decision dated June 27, 2012, the ALJ found Roberts not disabled.  (Tr. 19-34).  On August 12, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner for purposes of this review.  (Tr. 5-9).  Roberts filed for judicial review of the final decision on November 11, 2013. [1].

### B.   Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic

2

work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.     Background

### 1.     Plaintiff's Testimony and Subjective Reports

Roberts reported that the conditions preventing him from working are a history of bilateral shoulder surgery, eye surgery, diabetes, arthritis, carpal tunnel syndrome, headaches and neck pain. (Tr. 149). He reported being 5'11" and weighing 280 pounds. (Tr. 149). However, he neither reported nor testified that his obesity contributed to his disability. He reported that he stopped working in March 2010 due to his conditions. (Tr. 41; 149). He had previously been employed as a "live hanger" and a meat cutter, in the food production industry. (Tr. 150). He reported having been injured on the job in 2000 and again in 2008. (Tr. 156). He testified that he sought other work in the same industry, but could not perform it because he cannot stand for

long periods of time.  (Tr. 42).  When asked about jobs that involved mostly sitting, he testified that he also cannot sit for long periods.  (*Id.*).  When asked whether he could perform jobs that would permit alternating sitting and standing he testified "I guess, I don't know."  (*Id.*).

Roberts testified that his worst pain is in his back, extending up to his neck and down his legs.  (Tr. 42).  He takes pain medication, which does not help.  (Tr. 43).  He also underwent injections, which also did not help.  (Tr. 47; 49).  He reported that his pain interferes with his ability to sleep at night.  (Tr. 47).  He naps three times a day for 45 minutes at a time as a result.  (Tr. 51).  He testified that his pain is relieved by walking, or by lying down for up to an hour.  (Tr. 48).  He reported that even after the surgery on his arms, he still has pain when lifting them over his head.  (Tr. 49).  He also testified that he uses a cane for balance.  (Tr. 49).  He rates his pain at a 9/10 before medication and a 5-6/10 after medication.  (Tr. 50).  He also testified that his diabetes causes headaches and also the numbness that he experiences.  (Tr. 51).

Roberts reported that his days consist mainly of watching television and walking around the house.  (Tr. 45-46; 159).  He has occasionally tried to go fishing, but testified that he cannot do it.  (Tr. 46).  His wife does most of the chores, including cooking and cleaning, and Roberts mows the lawn approximately once every two weeks for an hour.  (Tr. 44-46; 159-60).  He reported difficulty lifting his arms above his head, getting in and out of the bath and sitting down and getting up from the toilet.  (Tr. 159).  He reported going outside every day and that he can go out alone, but that he does not drive because he has no license.  (Tr. 44; 161).  He shops weekly for food and clothes, taking approximately 3 hours at a time to do so.  (Tr. 44; 161).  He spends time daily with others either in person or on the phone and attends church weekly.  (Tr. 46; 162).  He also testified that he recently went on a solo bus trip to visit family in Mississippi.  (Tr. 47-48).

Roberts reported that his conditions interfere with his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs and use his hands. (Tr. 163). He reported not being able to sit or lie down for long periods of time. He testified to being able to sit for 45 minutes at a time, and stand for the same period. (Tr. 43). He reported being able to walk 1/3 of a mile before needing to rest for ten minutes. (Tr. 163). He testified that he can lift only five pounds. (Tr. 44). He testified to difficulty with his fingers and hands going numb, and that his right arm was worse than his left. (Tr. 44). He has difficulty buttoning buttons, picking up coins or tying ties. (Tr. 50). He reported taking several medications for his conditions, all of which he reported make him drowsy and dizzy. (Tr. 176). However, he later testified to no side effects as a result of his medications. (Tr. 43).

### 2.    *Medical Evidence*

#### a.    *Treating Sources*

In August 2000, Roberts underwent carpal tunnel release surgery on his left hand. (Tr. 207-11). That same month he was diagnosed with subacromial osteophytes and a "very small partial thickness supraspinatus tear" in his left shoulder. (Tr. 204). He underwent surgery to repair the tear in September of that year, and by November of the following year, after a course of therapy, he was discharged without work restrictions with 19% impairment to the arm and 11% impairment to his whole body. (Tr. 197-203; 205-206). In January 2007, Roberts underwent surgery to repair a suspected rotator cuff tear in his right shoulder. (Tr. 219-22). By January 2008, after a course of therapy, he was discharged to full unrestricted work duty at maximum medical improvement with 12% impairment in his right arm and 7% to his whole body as a result. (Tr. 215-18).

The next treatment notes in the file begin in September 2011, when Roberts established a

treating relationship with Dr. James Whitmyer. (Tr. 224). At this point Roberts weighed 306 pounds. *Id.* He reported having been treated in the emergency room in Mississippi for chest pain, which led to a diagnosis of diabetes and H. pylori, and Roberts was started on Metformin. (*Id.*). He reported having no insurance and Dr. Whitmyer, while assessing diabetes, stated that once Roberts had insurance, he would have him continue his Metformin and return in 2-3 months for labs and testing. (Tr. 225). He would also start him on Prilosec and a Prevpac for his H. pylori. (*Id.*).

Roberts returned to Dr. Whitmyer in November 2011, complaining of back pain that had been increasing over the last month, radiating to his neck, and rated his pain at a 9/10. (Tr. 245). Roberts reported suffering injuries in a motor vehicle accident in 2005 and having intermittent pain since that time, and that he had been seen by a doctor in Mississippi two years prior for a "leaking vertebrae," although no records were available. (Tr. 245). Upon exam, Dr. Whitmyer noted tenderness in the trapezius region, with mildly reduced left and right rotation. (*Id.*). There was increased left trapezius tone, but decreased right tone. (*Id.*). Dr. Whitmyer also noted bilaterally middle and lower paraspinal muscle tenderness with increased muscle tone. There was no tenderness over the sacroiliac joint and no instability. (*Id.*). He referred Roberts for a physical medicine evaluation and prescribed him Norco for the pain. (Tr. 245-46). Roberts returned to Dr. Whitmyer a few days later for a follow-up. (Tr. 243-44). He rated his pain at 6/10 with medication. (*Id.*). His weight at this appointment was 309 pounds. (*Id.*). It was also found that recent diabetes labs were abnormal and his levels had worsened. (Tr. 243). Roberts was given two vaccines, additional labs were ordered and he was prescribed a statin. (Tr. 244). No musculoskeletal exam was conducted at this appointment. (Tr. 243-44).

Roberts began treating with Dr. Frank Pollina, a physiatrist, in November 2011. (Tr.

6

267-68).   Roberts reported back pain and leg numbness for the past 6-7 weeks, rating his pain

between 8-10/10.   (Tr. 267).   He also reported some discomfort in his neck and difficulty

bending.   (*Id.*).   He reported not having these difficulties in the past.   (*Id.*).   An exam revealed

that Roberts leaned to the left when standing and had decreased forward flexion of the lumbar

spine.   (Tr. 268).   Moderate tenderness was noted over both sacroiliac joints, but a straight leg

raising test was negative bilaterally and there was no abnormality in Roberts's sensory or reflex

exams.   (*Id.*).   Dr. Pollina diagnosed Roberts with low back pain, thoracic/lumbar radiculopathy

and sacroiliac joint pain.   (Tr. 267).   He prescribed Naprosyn and physical therapy and ordered a

spinal x-ray.   (*Id.*).   X-rays of Roberts's lumbar spine taken the same day revealed pronounced

lumbar lordosis and mild osseous degenerative changes most pronounced at L5-S1.   (Tr. 279).

Roberts treated with Dr. Pollina again in early January 2012.   (Tr. 265-66).   He reported

being unable to get into physical therapy yet, and that the Naprosyn did not help his pain.   (Tr.

265).   He also reported pain in his left shoulder and the left side of his neck, and that his right leg

gives out at times.   (*Id.*).   An exam revealed tenderness over the sacroiliac joint and the

lumbosacral paraspinals.   (Tr. 266).   A straight leg raising test was normal, as was motor

strength, senses and reflexes.   (*Id.*).   The rest of his spine was non-tender.   (*Id.*).   Dr. Pollina

assessed thoracic and lumbar radiculopathy, spinal stenosis and low back pain, referred Roberts

back to physical therapy and a lumbar spine MRI, and prescribed him a Medrol Dosepak.   (Tr.

265).   A lumbar spine MRI taken on January 17, 2012, revealed "pronounced lumbar lordosis,"

and "[m]ild osseous changes of the lumbar spine most pronounced at L5-S1."   (Tr. 279).   It also

revealed a mild disc bulge and facet hypertrophy at L3-4 without central canal of neural

foraminal narrowing, a posterior disc bulge encroaching upon the ventral thecal sac at L4-5

without central canal or neural foraminal narrowing, and a posterior disc bulge flattening the

ventral thecal sac and encroaching upon the existing S1 nerve roots at L5-S1 without producing mass effect or compression. (Tr. 278). However, no significant central canal stenosis was seen at this level, although there was mild neural foraminal narrowing. (*Id.*).

Roberts returned to Dr. Pollina on January 20, 2012, for a follow-up. (Tr. 262-64). Roberts reported that the Metrol Dosepak did not help his pain. (Tr. 262). He reported still not having any physical therapy. (*Id.*). An EMG performed that day revealed evidence of sensorimotor peripheral neuropathy that Dr. Pollina attributed to Roberts's diabetes. (*Id.*). The exam revealed tenderness throughout the lower back, with a negative straight leg raising test, and normal motor strength and sensory exams. (Tr. 263). It was noted that Roberts's reflexes were depressed and there were no long tract signs. (*Id.*). Although Dr. Pollina found "no evidence of lumbar radiculopathy on [the January 20th] exam," he nevertheless assessed "Radiculopathy – Lumbosacral," prescribed Vicodin and instituted a therapy program for lumbar radiculopathy and sacroiliac joint dysfunction. (*Id.*).

On January 26, 2012, Roberts was evaluated for physical therapy. (Tr. 271-72). He reported back pain that radiated down his legs with an intensity of 2/10 at rest and 7/10 with activity. (Tr. 271). He reported trouble performing yard work, caring for his grandson, bending, lifting, standing or walking more than 10-15 minutes and that his sleep was interrupted due to pain. (*Id.*). He also reported that his right knee would occasionally give out. (*Id.*). An exam revealed lumbar tenderness and decreased range of motion, decreased bilateral lower extremity extensibility, increased lumbar lordosis, decreased core strength and poor postural awareness. (*Id.*). Dr. Pollina's "primary diagnosis" was "Thoracic or Lumbosacral Neuritis or Radiculitis Unspecified." (*Id.*). He issued Roberts a physical therapy schedule of three times a week for four weeks, but there are no additional physical therapy notes in the record. (Tr. 272).

8

Roberts returned to Dr. Whitmyer again four months after his last appointment, in March 2012, for a recheck of his blood levels. (Tr. 275). It was noted that his hemoglobin levels had again worsened. (*Id.*). He also rated his pain generally at a 0/10. (Tr. 276). He was assessed with diabetes "without mention of complication" and "not stated as uncontrolled." (*Id.*). He was started on Januvia and asked to follow up in three months. (*Id.*).

Roberts did not return to see Dr. Pollina for almost six months. In the interim, on May 25, 2012, Dr. Pollina issued a medical source statement for Roberts, diagnosing him with lumbar radiculopathy and SI joint pain and listing his prognosis as "unknown." (Tr. 282). Dr. Pollina opined that Roberts suffered from back pain that radiated down his legs, as evidenced by EMG results and a tender SI joint. (*Id.*). Dr. Pollina opined that Roberts's impairments had lasted or could be expected to last at least twelve months, and that Roberts was not a malingerer. (*Id.*). He opined that Roberts's symptoms would frequently interfere with his ability to perform simple work tasks. (Tr. 283). He further suggested that Roberts could walk less than one block, could sit and/or stand for only ten minutes at a time for a total of less than two hours a day and would need to walk every ten minutes for at least two minutes at a time during the day. (Tr. 283-84). He also opined that Roberts would need a sit/stand option at will and would need to take unscheduled breaks during the day, although he did not say how often or for how long. (Tr. 284). He opined that Roberts could only rarely lift ten pounds and never more, and could only rarely twist, stoop, crouch or climb stairs and never climb ladders. (Tr. 284-85). He opined that Roberts had no trouble reaching, handling or fingering, and did not need a cane for standing or walking. (*Id.*). He noted that Roberts's conditions would produce good and bad days, but did not estimate the number of those days per month. (Tr. 285).

Roberts returned to treat with Dr. Pollina in June 2012, where he reported having one

steroid injection that he felt was of "slight help" and desired to have two more.  (Tr. 288).  He also reported pain in both hands, right greater than left.  (*Id.*).  An EMG revealed no acute abnormalities and "specifically no evidence of carpal tunnel syndrome."  (*Id.*).  Upon exam, no sacroiliac joint tenderness was noted, and the remainder of the exam was unremarkable, with normal motor strength, senses and reflexes, and a negative straight leg raising test.  (Tr. 289).  Dr. Pollina recommended two additional lumbar epidural steroid injections and a cervical MRI to rule out possible stenosis.  (Tr. 289-90).  A cervical spine MRI taken a few days later revealed a loss of disc space height and hydration at every level.  (Tr. 293).  It also revealed a disc herniation and spur formation centrally at C3-C4, with mild flattening and deformity of the ventral aspect of the cord, right greater than left, and uncovertebral and apophyseal joint degeneration causing bilateral foraminal narrowing.  (Tr. 293).  It also showed another herniation at C4-C5 causing mild flattening and deformity of the anterior right aspect of the cord and severe bilateral foraminal narrowing.  (*Id.*).  It also showed a spur to the left at C5-C6 causing mild flattening and deformity of the cord, and bilateral severe neural foraminal compromise.  (*Id.*).  There was no evidence of demyelination, myomalacia or cord edema.  (*Id.*).

> b.    *Consultative and Non-Examining Sources*

In November 2011, Roberts underwent a consultative examination with Dr. Bita Shaw (Tr. 234-40).  Roberts reported being unemployed since he moved to Michigan in 2010.  (Tr. 234).  He reported pain in his back, both shoulders and both hands, but denied numbness in his feet or hands.  (*Id.*).  He reported diabetes with a hemoglobin level that was uncontrolled.  (*Id.*).  An exam revealed symmetrical deep tendon reflexes of 2+ in all extremities, normal heel-to-knee and finger-to-nose testing, and a negative Romberg test.  (Tr. 235).  It also revealed a full range of motion in Roberts's cervical spine and no spasms on palpation throughout the back.  (Tr. 235-

36).   Range of motion of the thoracolumbar spine was 0-60 on forward flexion and 0-10 on extension.  (Tr. 236).  Lateral flexion was 0-20 bilaterally and a straight leg raising test was negative.  (*Id.*).  All of Roberts's extremities had a full range of motion.  (*Id.*).  In addition, Roberts's gait was steady, no limp was noted, and he did not use a cane.  (*Id.*).  His grip was 5/5 bilaterally and although there was slight tenderness in the snuff box region, a Tinel's sign was negative bilaterally.  (*Id.*).  His muscle strength was full in all extremities and he was able to get on and off the table and chair without assistance.  (*Id.*).

Based on the exam, Dr. Shaw diagnosed Roberts with obesity, diabetes, post-status for bilateral shoulder cuff repair surgery, left carpal tunnel surgery and right orbital fracture surgery.  (*Id.*).  She opined that Roberts could work an eight-hour day, sit, stand, walk, and bend minimally and lift at least 10 pounds of weight without difficulty.  (*Id.*).  She opined that he should avoid heights and machinery operation.  (*Id.*).

On November 29, 2011, Dr. Shahida Mohiuddin reviewed the available records, including Dr. Shaw's report, and determined that Roberts had the capability to perform light work, lifting 10 pounds frequently and 20 pounds occasionally, and sitting, standing and/or walking 6 hours a day each.  (Tr. 63).  He could also push or pull without additional limits, and could occasionally climb ramps or stairs, ladders, ropes or scaffolds, balance, stoop, kneel, crouch, or crawl.  (*Id.*).  He was limited in his ability to reach overhead bilaterally, but unlimited in his ability to handle, finger or feel.  (Tr. 64).  He further needed to avoid concentrated exposure to extreme temperatures, humidity, vibration or hazards.  (Tr. 64-65).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Roberts was not disabled within the meaning of the Act.  (Tr. 19-34).  At Step One she determined that Roberts

had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 24).  At Step

Two she identified the following severe impairments: diabetes, spine disorder, arthritis, status

post bilateral rotator cuff tear/repair, and obesity.  (*Id.*).  She determined that although Roberts

had a history of carpal tunnel syndrome, the medical evidence of record did not support a finding

that this condition, which had been treated surgically in 2000, had more than a minimal impact

on Roberts's ability to perform basic work activities.  (Tr. 25).  At Step Three the ALJ concluded

that none of Roberts's severe impairments, either alone or in combination, met or medically

equaled a listed impairment.   Next, the ALJ assessed Roberts's residual functional capacity

("RFC"), finding him capable of light work

> except the claimant cannot climb ladders, ropes, or scaffolds.   The
> claimant can occasionally climb stairs and ramps, balance, stoop, kneel,
> crouch, and crawl.   The claimant can occasionally reach overhead
> bilaterally.  The claimant can frequently handle and finger.  The claimant
> should avoid temperature extremes, vibration, concentrated exposure to
> wet/humid conditions, and hazards, such as moving machinery and
> unprotected heights.  The claimant requires a sit/stand at will option at the
> workstation.

(Tr. 25).  In assessing the evidence to support this RFC, the ALJ gave "appropriate" weight to

the opinions of examining consultant Dr. Shaw and "significant" weight to that of non-

examining consultant Dr. Mohiuddin, but gave limited weight to the opinion of Dr. Pollina.  (Tr.

27-28).

At Step Four the ALJ determined that, based on the foregoing RFC, Roberts could not

perform his past relevant work.  (Tr. 29).  At Step Five, considering Roberts's age, education,

vocational experience, and RFC, and with the assistance of VE testimony, the ALJ concluded

that there was a significant number of other jobs in the national economy that Roberts could still

perform, and thus he was not disabled under the Act.  (Tr. 29-31).  Specifically, the VE testified

that a hypothetical claimant with the foregoing RFC could perform the jobs of assembler (2,500

jobs in the region), inspector (1,500 jobs), or hand packager (2,000 jobs).  (Tr. 30; 53-54).  The ALJ also testified that if the hypothetical claimant were limited to sedentary work, he would still be able to perform the jobs of assembler (2, 400 jobs), inspector (700 jobs), or machine operator (1,300 jobs).  The VE further testified that if the hypothetical claimant were to be off task for up to 20% of the day or could only sit, stand or walk for a total of two hours a day, all occupations would be precluded.  (Tr. 54-55).

E.      **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility

of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Roberts argues that the ALJ erred in her evaluation of the medical and opinion evidence of record, and in evaluating Roberts's credibility. Specifically, he argues that the ALJ erred in giving significant weight to the opinions of the consulting physicians who did not treat Roberts and who did not have his longitudinal medical record to review, and giving too little weight to the opinion of Roberts's treating physician, an opinion that Roberts argues is consistent with and supported by the medical evidence of record. He also argues that the ALJ impermissibly evaluated raw medical data to reach her RFC, rather than seeking a medical opinion that included

an evaluation of the evidence in question.  He further argues that the ALJ mischaracterized much of the medical evidence of record, and that evidence itself does not support the RFC assessment she rendered.  Finally, he argues that the ALJ's reasons for finding him less than fully credible are not supported by the record evidence.  As discussed below, the Court finds that certain of Roberts's arguments have merit and that the case should be remanded for further proceedings.

### 1.    *Characterization of Evidence*

While an ALJ is not obligated to discuss each and every piece of evidence in the record, *Kornecky*, 167 Fed. Appx. at 508, she still must fairly weigh the overall record.  Significant mischaracterizations of the record, or the failure to reconcile significant competing evidence against that which the ALJ finds to guide her decision, can warrant remand.  *See e.g. Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499-500 (6th Cir. 2012) (mischaracterization of activities of daily living, coupled with other errors, warranted remand).  Here, the ALJ found Roberts not credible, in part, due to his purported activities of daily living, which she characterized as including mowing the lawn, shopping, taking walks around the block and fishing.  However, the testimony and reports shows that Roberts cut the lawn only once every two weeks, walked not around the block, but only around the house or in his yard, and that while he tried occasionally to go fishing, he was unable to actually do so.  (Tr. 43, 46, 159-161).  While Roberts did report shopping weekly for up to three hours and taking a solo trip to Mississippi, he also reported having trouble with personal care, including bathing, getting up from the toilet and dressing, areas of daily living the ALJ did not mention.  (Tr. 159).

Similarly, the ALJ minimized certain medical records that were more consistent with the opinion of Roberts's treating physician than the ALJ's decision recognized.  For instance, the ALJ cited Roberts's cervical MRI results as revealing "minimal findings," which she

characterized as being a "loss of disc space height and hydration."  (Tr. 28).  However, the actual findings were more serious and included disc herniation, spur formation, cord flattening and deformity and foraminal narrowing at multiple cervical levels.  (Tr. 293).  At a minimum, the ALJ should have reconciled those findings against the ones she highlighted as supporting her conclusion.

The ALJ also failed to discuss important evidence in the record relative to Roberts's lumbar condition.  For example, she failed to note that Roberts's lumbar MRI showed a posterior disc bulge flattening the ventral thecal sac at L5-S1 and encroaching upon the existing S1 nerve root (without mass effect or compression) and mild neural foraminal narrowing, and that Dr. Pollina found "pronounced lumbar lordosis."  (Tr. 278-79).  While she cited the fact that Dr. Pollina interpreted the films as showing "no significant abnormality" she failed to note that at the same appointment Dr. Pollina found tenderness to palpation and depressed reflexes on exam, and that he instituted a therapy program "for lumbar radiculopathy and sacroiliac joint dysfunction," and prescribed Vicodin for pain.  (Tr. 28; 262-63).  The ALJ also failed to discuss other relevant records, including ones showing that Roberts began receiving injections for his pain, which were only slightly helping.  (Tr. 288-90).

The ALJ also failed to adequately discuss records related to Roberts's diabetes.  While she cited the fact that that Dr. Whitmyer's notes stated that Roberts's disease was "not uncontrolled" and that Roberts presented "without mention of complication," she failed to acknowledge that in the same treatment record, Dr. Whitmyer noted that despite being placed on Lisinopril for elevated microalbumin, Roberts's levels had worsened.  (Tr. 28, 275).  She also failed to note that this was the second time Roberts's microalbumin levels had been documented as worsening instead of improving, despite treatment.  (Tr. 243, 275).

16

Again, the Court is mindful that an ALJ need not discuss every piece of evidence for her decision to be supported by substantial evidence in the record. *Kornecky*, 167 Fed. Appx. at 508 ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006). The Court is further mindful that mere mischaracterization of, or failure to discuss, certain record evidence alone will not generally be cause for remand. *See e.g. Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 242-43 (6th Cir. 2002) (ALJ's mischaracterization of activities of daily living insufficient basis for remand where credibility determination otherwise supported by substantial evidence of record). At the same time, however, the quality and volume of evidence not discussed by the ALJ may "raise[] serious doubts about the supportability of the ALJ's RFC finding" and overall conclusions. *See Wilcox v. Comm'r of Soc. Sec.*, No. 13-12549, 2014 WL 4109921, at *7 (E.D. Mich. Aug. 19, 2014). "Substantial evidence cannot be based on fragments of the record." *Laskowski v. Apfel*, 100 F.Supp.2d 474, 482 (E.D. Mich. 2000) (citing *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984). Here, the case should be remanded so that the ALJ can more fully address the medical evidence discussed above.

### 2. *Weight assigned to medical opinions*

Even if the shortcomings in the ALJ's analysis discussed above do not alone merit remand, the same result would be compelled by the ALJ's failure to adhere to the treating physician rule. An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ

declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5. An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, the ALJ gave little weight to Dr. Pollina's opinion that Roberts had disabling functional limitations (e.g., that he could sit and/or stand for only ten minutes at a time for a total of less than two hours a day) (Tr. 283-84), due to lumbar radiculopathy and SI joint pain. (Tr. 28). Her sole reason for doing so was that the opinion lacked the support of objective evidence. (*Id.*). The evidence the ALJ cited as being contrary to Dr. Pollina's opinion included (1) "a normal MRI of the claimant's lumbar spine," (2) "a negative EMG of his right upper extremity" and (3) "minimal findings on the MRI of his cervical spine." (*Id.*). However, none of these are "good" reasons for rejecting Dr. Pollina's opinion. Nor do they adequately support the ALJ's conclusion that Dr. Pollina was being "overly sympathetic" to Roberts in crafting his medical source statement. (*Id.*).

First, as noted above, Roberts's lumbar MRI was not "normal" but in fact showed degenerative changes at L5-S1, the very area Dr. Pollina opined was the source of Roberts's

18

lumbar and SI joint issues.  (Tr. 278; 282-85).  Dr. Pollina instituted a therapy program for lumbar radiculopathy and SI joint pain, and prescribed Vicodin.  (Tr. 262-64).  Thus, the lumbar MRI, and Dr. Pollina's reaction to it, is not inconsistent with his opinion of Roberts's functional limitations.

Second, the ALJ points to a negative EMG of Roberts's upper extremity as evidence contradicting Dr. Pollina's opinion.  (Tr. 28).  However, Dr. Pollina does not render an opinion on Roberts's upper extremities, but limits his opinion to Roberts's lumbar pain and radiculopathy.  (Tr. 282-85).  The ALJ's cite to Roberts's cervical MRI is also misplaced, as Dr. Pollina did not opine on Roberts's cervical spine.  (Tr. 28; 282-85).  Moreover, as discussed above, the results of that test revealed more than just "minimal findings" as the ALJ suggests. (Tr. 293-94); s*ee Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 193 (6th Cir. 2009) (remanding where ALJ's reasons for finding treating physician opinion failed to reflect actual evidence of record, and thus weight assessed by ALJ not supported by substantial evidence of record).

To be sure, the ALJ did give some valid reasons for her decision to give limited weight to Dr. Pollina's opinion.  For instance, she noted Dr. Pollina's finding that the "'MRI did not reveal any significant abnormalities,'" which is at least potentially inconsistent with his other findings. (Tr. 28).  However, as discussed above, there were enough other significant pieces of evidence supporting Dr. Pollina's opinions that were not adequately discussed, that remand is appropriate so that they may be appropriately weighed against the competing evidence on which the ALJ relied.

The existence of other potential "good reasons" that the ALJ *could* have cited for giving Dr. Pollina's opinion lesser weight than Roberts argues for does not change matters.  For

instance, Dr. Pollina cited as support for his opinion a lower extremity EMG, when in fact the results of that test showed that the sensory deficits were likely the result of Roberts's diabetes, not his musculoskeletal problems.   (Tr. 262-64).   The Commissioner notes as much in her argument, attributing that reason to the ALJ.  [21 at 8].  However, this was not cited by the ALJ as a reason for rejecting Dr. Pollina's opinion, and the Court may not find support for the ALJ's decision using *post hoc* analysis offered by the Commissioner.   (Tr. 28); *see S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) (a reviewing court must judge propriety of agency action "solely by the grounds invoked by the agency"); *see also Hunter v. Astrue*, No. 09-2790, 2011 U.S. Dist. LEXIS 148585 at *11 (N.D. Ohio Dec. 20, 2011) (remanding case where Commissioner attempted to rationalize on appeal insufficient examination of evidence by ALJ).   Another potential reason for discounting Dr. Pollina's opinion could be the fact that Roberts had only treated with him a handful of times with a four-month gap in between the first set of appointments and Dr. Pollina's opinion.   (Tr. 245-46; 263-68; 282-85).   Yet, the Court is not permitted to find harmless error where the treating physician rule has not been followed, regardless of the presence of evidence that would otherwise support such a decision.   *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) ("An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."); *Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely."); *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. Appx. 852, 862 (6th Cir. 2011) (finding ALJ legal errors in applying treating physician rule not harmless error); *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (noting "[w]e do not

hesitate to remand" when an ALJ violates the treating physician rule).  Thus these other potentially "good reasons" to reject Dr. Pollina's opinion are unhelpful where it does not appear the ALJ relied on them in her decision.[1]

Finally, the ALJ's failure to adhere to the treating physician rule is exacerbated by the fact that she gave significant weight to the opinion of non-treating consultant physicians, neither of whom were apprised of the lumbar films that Dr. Pollina had in his possession, nor the later cervical films that showed additional degenerative changes.  (Tr. 27; 57-66; 234-40; 278; 293-94).[2]

In light of all of these matters, the Court cannot conclude that the ALJ's decision is supported by substantial evidence, and the case should therefore be remanded.

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Roberts's Motion for Summary Judgment **[17]** be **GRANTED**, the Commissioner's Motion **[21]** be **DENIED** and this case be **REMANDED** for further consideration consistent with this Report and Recommendation.

Dated: January 8, 2015                                s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                            United States Magistrate Judge

---

[1] While this case presents a close call and may not ultimately result in a different disposition, the nature and extent of the evidence not discussed by the ALJ, and the other issues discussed herein, lead the Court to conclude that remand here is not "an idle and useless formality," but rather a necessary step to ensure that Roberts's application receives appropriate consideration under the law.  *Cf. Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. Appx. 171, 173 (6th Cir. 2004) ("When remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game.").

[2] Because the Court recommends remand for the reasons stated above, it does not address Roberts's other alleged errors.  *See Pittman v. Comm'r of Soc. Sec.*, No. 12-980, 2014 U.S. Dist. LEXIS 27431 (S.D. Ohio Mar. 4, 2014) (remand on certain issue obviates need to address all alleged errors).

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 8, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager